And now, the third case on today's calendar, 25-2652, Troleos De Venezuela S.A. N.L. v. MUFG Union Bank, N.A. Good morning. I understand, Mr. Godley, so the counsel for the appellant to understand you're going to split argument half and half, is that right? That's correct, Your Honor. And Mr. Godley goes first, and then Mr. Timotheo goes next, and then for the appellee, we will have Attorney Hansford, right? Okay, and you've got it all? I've got it all. All right, well, I hope you brought a bottle of water. We will then allow each of the appellant's lawyers, you'll have two minutes apiece for rebuttal. Okay, but we are, just to warn you, just because you're splitting it in the aggregate, you're not going to, as a practical matter, get any more than the other side, so you're going to need to be attentive to the clock there. Before we do actually start the arguing, and before we run the clock, would you just articulate for the courts and we keep track, which issues each of you has divvied up, so we know the order of events? Sure thing. I will be handling the comedy and active state issues, and Mr. Timotheo will be handling the merits of the Venezuelan law issues. Okay, very good. Thank you. You may proceed whenever you're ready. Thank you, Your Honor, and may it please the Court, Mike Godley representing Appellant PTV Holding. Articles 150 and 187.9 of the Venezuelan Constitution hold that any national public interest contract must be approved by the Venezuelan National Assembly. The party's dispute boils down to whether the National Assembly's approval authority covers contracts executed by PDVSA, Venezuela's state-owned national oil company, or whether that approval authority is limited to only contracts in which the national executive is a party. Over half a decade of litigation, the Republic has made five submissions in U.S. courts, offering a patient, clear, thorough, and authoritative interpretation of Venezuelan law. Like the Chinese Ministry of Commerce in the vitamin C litigation, the Republic has explained a feature of Venezuela's constitution that may not be obvious to U.S. courts. In Venezuela's constitutional system, PDVSA is more than just a state-owned entity. PDVSA's responsibility over the lifeblood of Venezuela's economy means that many PDVSA's contracts directly implicate Venezuela's national economic interests. That interpretation is rooted in practice. For decades, the National Assembly has reviewed and approved PDVSA contracts under Article 150 and 187.9, even where the national executive is not a party. The district court rejected the Republic's interpretation of its own constitution. Can I just ask a question about that? Are there examples prior to 2017 of the National Assembly being asked to approve contracts pursuant to which PDVSA committed itself to substantial debt? So, the debt contracts, there would not be an example of that for two reasons. There are examples prior to 2017 of PDVSA contracts being submitted to the National Assembly for approval by the national executive. Those are cited in Brewer's supplemental report, which is at pages 3595-97 of the special appendix. With respect to the debt contracts, the reason that there wouldn't have been is because prior to this transaction, and this is explained in Ambassador Vecchio's letter and in the Republic's briefs, but prior to this transaction, PDVSA had never attempted to encumber a foreign asset as collateral in the issuance of a debt agreement. And many of the debt agreements would not have been subject to the constitutional restriction in Article 150 anyway, because they wouldn't have been contracts with foreign counterparties or foreign states. Well, but some of them were, and so I'm thinking through the significance of providing security. Certainly, if PDVSA got out over its skis on debt, its foreign-held assets would be vulnerable to collection, regardless of whether they had been specifically pledged. It interposed a few more steps for the creditors to collect it, but am I wrong about that? That doesn't necessarily mean that the contract would implicate provision in Article 150 to qualify as a national public interest contract. And I think part of the issue here is first that we are now splitting hairs over the scenarios in which the National Assembly chooses to assert its powers over a contract. There's no question that, in this case, the National Assembly did choose to assert its approval authority over the contract. And the way we get into an active state doctrine problem is by starting to ask, well, did the National Assembly apply that approval authority consistently over time? Do we feel like they've adopted a consistent practice? So let me, and maybe I'm misunderstanding sort of how the two issues relate to one another. This is helpful to understand, because when you said you were going to argue active state, and then it seemed like you started on the underlying question of whether approval is required. If approval isn't required, isn't that the scenario in which we get to your active state argument? Or is your active state argument that if approval is required, then the active state doctrine sort of tells us that the approval is denied, and if approval is not required, you lose all around? Is that sort of where we land? I think the court should begin with the active state question, because the active state question asks, is there an act of the sovereign that supplies a rule of decision in this case? Didn't we kind of suggest last time around that maybe it should be flipped, that before we resort to the active state, we should figure out what the governing law is, and whether or not approval of the National Assembly was required for this contract? This court can, of course, take the issues in whichever order it chooses. Under the Celestin's case and under Sabatino and cases like it, what the active state doctrine does is it supplies a rule of decision for the case. And so if you're looking to see, is there a rule of decision that we apply to the question of, were the bonds valid when issued, which is the issue that the district court was supposed to consider on remand from the New York Court of Appeals. Were these bonds valid as a matter of Venezuelan law when issued? If there is a rule of decision that applies to it, there's no need for this court to wade into the merits of Venezuelan law at all, because the rule of decision is supplied, and we think the rule of decision is supplied by the sovereign acts under cases like Celestin and under cases like Sabatino. But how do we understand the significance of what the National Assembly did if we don't understand what the legal framework is and what authority it didn't have under sort of underlying Venezuelan law? I guess I'm struggling with that. So under a long line of cases, the relevant question under the act-of-state doctrine is, what was the sovereign purporting to do? That's the language that this court quoted in its 2022 certification opinion. That's from Celestin. That's from Kirkpatrick and other cases that follow it. You don't ask, what did the foreign sovereign legally accomplish? You ask, what were they trying to do? What were they claiming to do? This court has already essentially recognized what the National Assembly was purporting to do. What were they purporting to do? They were purporting, according to this court's certification opinion in 2022, which we agree with, they were purporting to assert their constitutional authority over the exchange, and they were rejecting the pledge and rejecting the transaction in the course of asserting its constitutional authority over the exchange. So your argument is, if that's what they were purporting to do, then it doesn't matter whether in fact they had such constitutional authority because their assertion of that authority under the act-of-state doctrine creates the authority. Is that what I'm understanding? It's more than that, Your Honor. It's not just that. It's that once you understand what they were purporting to do or what authorities they were asserting, you cannot examine whether that was consistent with Venezuelan law. That is the precise holding of Banco de España. That is the precise holding of Sabatino. And that is exactly the point of the act-of-state doctrine. When it is made to appear that the foreign sovereign has acted in a certain capacity, that's the language from Raquel, when it is made to appear that the sovereign has acted in a certain capacity, you don't then ask, well, did they comply with all of the requirements of their own country's constitution? In Banco de España, for example, it was a secret decree that the ambassador from Spain provided to the United States court. The court didn't ask the question, did that decree get promulgated correctly? Was that decree consistent with other elements of Spanish law? It was simply the fact that the decree conferred title to the silver that moved the court. So let me ask then, because one of the things we talk about is does the purported act operate extraterritorially? So my question is, the 2017 bonds, where were they to be brought for the purpose of the exchange? I actually don't know the answer to that question, Your Honor. I don't think it matters for purposes of determining the sovereign act here. Let me push on that a little bit. If it turns out that the record tells us that the exchange that was the subject of the National Assembly resolution in 2017 was the presentation of bonds that matured in 2017 in New York City to exchange for 2020 notes that would themselves live in New York City, why isn't that an entirely extraterritorial transaction? I understand the question. I thought you were asking me solely about the 2017 bonds on their own terms. The exchange wasn't meant to be an exchange that contemplated acts in New York. We don't dispute that. The exchange would have involved contracts under New York law, payments under New York law. That's not in dispute. The legal question before the court, and this is controlled by the New York Court of Appeals definition of 8110 validity, is were the bonds or the securities valid when issued, or was there a defect by virtue of the National Assembly's lack of approval that rendered them invalid when issued? But they were issued here. The issuance occurred, the approval occurred in Caracas in Venezuela, and the lack of the National Assembly's approval authority, the lack of authority that provides the defect for the bonds is entirely an issue of Venezuelan law. No one disputes that. And it is an entirely issue that occurred between governmental entities in Venezuela. How do we figure out the situs of the issuance? It's kind of an interesting question. Is it when the piece of paper that documents the bond is generated, that's the issuance, or when it's presented to someone else? It can't be that when somebody has the idea that they're going to issue bonds, it's being issued in the place where they had the idea. There's something that happens when you issue bonds. That may be true, but the defect present in the vehicle, and the defect that's present in the security is the absence of approval. Well, we're in a circle though, right? If the absence of approval is a defect as a matter of Venezuelan law, that's a question that I think we're going to be talking about with your colleague. But if the defect purportedly arises as a result of an active state, then we have to ask the question, does an active state purport to operate extraterritorially? And that brings us to New York, and that's why I'm struggling with hearing from you first. So the instruction that is the instruction of the September resolution is an instruction that if it is effective, occurs entirely within Venezuela. The instruction of the September resolution is effectively, you may not issue this debt. It is an instruction to PEDAVASA. It is a command from the National Assembly that says, we reject your proposal for the refinancing of debt. You may not do so. If it is effective, it's effective because it occurs in Venezuela, and it deprives PEDAVASA of the legal authority under Venezuelan law of moving forward with the transaction and issuing the debt, and it means that the bonds were invalid when issued. I don't think it matters under the active state doctrine whether there is one component of that that might occur in New York, and the reason I don't think it matters is because in cases like, for example, Sabatino, Sabatino involved the expropriation of sugar that's sitting at the port outside of Cuba, but ultimately involved a dispute over payment between entities based in New York, and it was a dispute about whether one entity could repay another entity in funds that were being held by a receiver in New York state court. The fact that there's a spillover effect into the United States doesn't answer the question of whether the expropriation of sugar... Yeah, but the sugar was sitting in Cuba. That's right, but... What's sitting in Venezuela? What's sitting in Venezuela at the time of the national... What's this so-called sugar? What's sitting there is the authority to issue the debt. It's the legal authority to commit PEDAVASA to a repayment obligation. I guess I don't see the analysis. Well, it's because if there is a debt... If the sugar was sitting in New York in Sabatino, would you say, Yeah, but the authority to sell the sugar was in Cuba? No, I'm... Would it come out the same way? No, I'm serious. What's the thing? The point is... That it's an extraterritorial taking. There is no taking in this case. Or extraterritorial action. Our argument... I guess I'm not following your analogy. Our argument is that there is no extraterritorial act or taking in this case. If the act is effective, it's effective because it occurred entirely within Venezuela, and what it did is it deprived PEDAVASA of the legal authority to move forward with authorization to engage in the transaction. And that is the precise question that is at issue under Section 8.1.10 of validity in this case. So, I think we've worked through some of the actions. Do you have some further questions? I have. I just want to sort of... Back up. ...focus things, sort of, not work things. But I've read your 2018 letter about the consequences of the change in administration, but I just... I'm trying to understand. Has the new administration weighed in at all on Venezuela's position on this? There has been no weigh-in or change in position that the Republic has taken in this case. Okay. And then the other question I had is, you know, through much of this litigation, there was the U.S.-recognized Guaido-appointed PEDAVASA board, and then I understand there was sort of a parallel Maduro-appointed board. What's the status now? Does PEDAVASA have two boards, or does it have one board? And what does that look like? Well, for purpose of this case, there is one PEDAVASA, and it is represented by my colleague here, Mr. Kim Fayab. There's been no change of any kind that has been put on the docket or is in the record of this case. You have seen in some litigation motions to intervene or substitute parties. That has not occurred in this case, and so on the record before us, the issue is simply not presented. All right, why don't we turn to your colleague, and let's hear about some of the other ones, the Venezuelan law, or whatever is within the ambit of your arguments. Thank you, Your Honor, and may it please the Court. As to Venezuelan law, the issue in this case is whether Article 150 of the Venezuelan Constitution categorically requires that the national executive be party to national public interest contract, and therefore excludes contracts by decentralized state entities. The text and purpose of Article 150 preclude this interpretation, and the Venezuelan Court decisions, including Congress' philosophies, do not hold that wise. First is to the text. Article 150 contains two requirements. The first sentence mandates national assembly approval for national public interest contracts where required by statute. The second sentence mandates such approval for contracts with foreign counterparties without the need for separate legislation. There is no dispute that for decades, the Venezuelan executive has submitted pursuant to Article 150's first sentence, and the national assembly has approved joint venture contracts including by beneath eight billiards where the national executive was not the party. The term national public interest contract must be read consistently throughout Article 150, and it cannot mean that contracts where the national executive is not the party qualify that the first sentence of that provision but not unto the second. Why doesn't the distinction that you just described support the opposite inference? That if the Constitution is going to purport to require national assembly approval for actions of entities that are part of a decentralized government, that needs to be reflected in statute. Otherwise, we're focusing on the second sentence that's the central government. Why isn't that an equally plausible sort of inference from that contrast that you've set up? Your Honor, because the answer actually lies on Andres Velazquez but also in the opinions of, in the comments of the Venezuelan scholars, is the second sentence operates as a direct command. So if a national public interest contract, which can be done by decentralized entity, is concluded with a foreign non-divisional counterparty, it has to go to the national assembly irrespective of the separate legislation. So not with Velazquez, the court actually openly said the financial of the public administration does not require submission of credit transactions to the national assembly. But the court of Andres Velazquez said that law cannot insulate submission of contracts with such credit transaction contracts with foreign counterparties to the national assembly. That is a requirement that does not depend on independent legislation. It operates as a direct constitutional command. And that has been a historical feature in Venezuelan constitutional law since the early 20th century. The other point I would like to make is it's also important to consider the purpose of Article 150. And limiting the term national public interest contract only to countries by the national executive would eviscerate and contradict that purpose. Article 150 was expressly drafted in 1999 to counter a proposal by then-President Hugo Chavez which sought to limit the scope of Article 150 and of the national assembly approval requirement to only countries by the national executive. The constituent assembly rejected that proposal and that is in the materials of the constituent assembly which you can see in the appendix 52.25 or 52.38. I'm sorry, can you just back up to Andres Velazquez? I'm still having trouble seeing how you get around that. So let me try to explain to Andres Velazquez. And focus on the language used. I don't want to hear big picture. You can use big picture too. The big picture usually obscures what the court actually said. Focus on what they said. Because I sort of understood you to make a couple decisions. One, they didn't really say what the other side says they said. Even if they didn't say it, who cares? It's not really binding. The last one, I have to say, is not a particularly persuasive suggestion. But the first one, tell me why Andres Velazquez doesn't say what they say it says. So I think there are two points on it. One is, if you look at the final discussion that the other side focused on, the district court did, and what Andres Velazquez discussed, what they were discussing, they were discussing in the final discussion in the Venezuelan Constitutional Scholarship about the predecessor provision to Article 150, Article 126 of the 1986 Constitution. That provision used two different terms. It used the term national interest contract. And national, state, or municipal public interest contract. And there was a lot of Venezuelan scholarship as to whether or not the term national interest contract, national public interest contract, was the same or different. The Constitution of Andres Velazquez said that discussion has been resolved by the 1999 Constitution, which only uses the term national public interest contract. That discussion, that analysis, has nothing to do with the question whether Article 150 and the national public interest contract subject to Article 150, encompass or do not encompass decentralized state entities. And when the Constitution of Andres Velazquez said we will specify the meaning of the term national public interest contract, it explained that this is a contract whose purpose is determinant essential to accomplishing the purpose and objectives for the Venezuelan state. This is at page 2117 in the appendix. That is the test of Andres Velazquez and under that test, this contract qualifies because the potential loss of CITCO, which is a governmental asset of strategic importance in an industry where state ownership is constitutionally required in Venezuela, is certainly going to be determinant or essential to the Venezuelan state. Strategic importance is... I guess I'm looking for what... That doesn't seem closely tied enough to what they're saying in Andres Velazquez. I mean, how do you determine what... It's not the Republic being a party to or a guarantor of whatever the transaction is. Now you're saying strategic importance? That doesn't... A lot of things could have strategic importance to the Republic. I don't know that that's... That seems too broad of an interpretation of what the case is saying. I think you can look at these cases, the Constitution of Andres Velazquez that was dated Andres Velazquez. You're all... Stick with this one. No offense. Stick with this one because... I mean, we deal with this kind of analysis. And I know it's not perfectly analogous. Look at what the Supreme Court said. And if we've got a holding, we're stuck with it, right? Regardless of... Well, we think the reason for it is this, right? The reason for the holding is that but we can't extrapolate back to the reason and ignore the holding. So stick with... Identify what you say is the holding here. And I get it. It's a civil law country. It's not exactly the same adjudication. But show us the money words, the money paragraph, where you think that they crystallized the rule that is embodied in Andres Velazquez. And tell us why that key paragraph doesn't mean what they say it means. Your Honor, the key holding is, and this is, again, I think on page... It's on the page, yeah. It's page appendix 2117. Yeah. It's a rule I quoted where Chambers said, the national public interest contract is, I quote, is a contract, I quote, whose purpose is determinate or essential to accomplishing the purpose and objectives of an insolent state. And then continue saying it's a contract... It's the purpose? That's the holding there? That's the limiting language? Is that a contract that has a purpose? This goes back to Judge Lee's question. I mean, that's a contract that anybody can have. You have somebody who's, I don't know, a very influential business in Caracas and they're engaging in a contract that could have strategic value to the country because, say, they control some key natural resource. You wouldn't contend that because we extrapolate to this big picture that it has strategic value to Venezuela, it's covered by this, would you? No, of course not. So that's why I need some more specific language. A contract by a private and sole individual will not be national public interest. So you're extrapolating way too far into generalities here. I did not mean to. I think the other requirement is that it has to be a contract concluded by a national state entity, whether by an entity of a national executive such as a ministry, or an entity of a decentralized public administration such as state-owned company or state economist institute. And this is why it's important to understand how the role that these decentralized entities play in the Venezuelan governmental structure. In the Venezuelan constitutional structure, decentralized, the national executive effectuates its policy, particularly in the contracting sphere of fully decentralized entities. They are attached to a specific ministry. They act under the direction of the ministry. They're the ones that actually conclude, enter into contracts. It is quite rare that the ministry will enter directly into a contract. And that's why Venezuelan constitutional scholars, as far back as in 1961, Professor Horace Martha said, if you exclude decentralized entities from the scope of Article 126, but from the scope of a national public and its contracts, you will allow the national executive to evade that requirement of a national assembly approval. I'm sorry, the rule of law. When we have specific rules of law, you can often evade them by doing something different, right? If the letter of the law says do A, but the letter lets you do B, and that evades the purpose or the spirit of A, usually the answer is tough luck. So I guess I'm not seeing why allowing, if a process or a procedure is banned by, say, their constitution, but you can do some other process or procedure that gets you to the same end point. Again, the answer is, who cares? I think the answer to that question is here in the text of Article 150, when it refers to the national assembly's authority to approve national public and its contracts, that power is not limited to just contracts by the national executive. It also encompasses contracts by... Right, right, right, I get that, but that's your endgame, right? That's the conclusion you wish us to draw, but you can't say that must be the conclusion because anything else would allow, you know, would allow... If the constitution limits these sorts of contracts to ones that are signed by an actual executive department, then you don't get the result that the constitution probably wants. That seems to be the argument you're making, which is not a particularly persuasive one. I think you look at the purpose of that provision. No, again, you're going back to purpose and you're going away from the text of the provision and what it says you can do and what Andres Velasquez says you can or can't do, as opposed to extrapolating out and saying, well, there's some big purpose here, so let's broaden that. Well, Joanna, you can look at the text of Article 150. It does not say, it does not reference national executive. It references that the National Assembly has the power to approve national public interest contracts. There is no limitation of those contracts to the national executive. And look at, again, it's important to read Andres Velasquez of the National Constitutional Scholar's Fed in conjunction with constitutional chamber and subsequent decisions, Ina Belka a year later and then Attorney General to five years later. Can I, before, I do really want to talk about the subsequent ones, but here's my question about Andres Velasquez. I agree that the issue in that case had nothing to do with whether the decentralized public administration versus the centralized executive were subject to this. But the court did have this phrase, where it said, contracts concluded by the republic through the competent organs of the national executive. That was the sort of limiting phrase and that's been repeated in subsequent cases. We're not Venezuelan scholars, so we don't know with certainty whether that includes the decentralized public administration. But the district court put a lot of emphasis, and I think understandably so, on the fact that your own experts at a prior time were very critical of this decision precisely because they thought it purported to exclude from the scope of this requirement, the National Public Interest Contract Approval Requirement contracts for entities like PDVSA. If we think this decision, if we think, oh, it's compelling to criticize this decision on that basis, aren't we still stuck with your experts' prior understanding that that's in fact what this did? I think our experts, what they said is they were concerned at the time that this decision could be misused to mean that Anandas Velazquez, the consular chamber in fact restricted National Public Interest Contracts in that way. And I think they were particularly concerned because at the time they were writing in 2015-17, the independence of the Supreme Judicial Tribunal was being broken and the judges were being replaced by the Maduro-appointed judges, many of whom the United States actually sanctioned. So I think they were concerned that that decision... But the Anandas Velazquez decision was in 2000. It was in 2002, but I think some of the writings that our experts have where they criticize and said, well, this decision could be used to argue for restrictive interpretation, that was those writings came in 2015-17. And they were not alone. Other constitutional scholars, such as Duke Corridor, also expressed a similar concern. Now, I do want to acknowledge there is a footnote in Professor Brewer's article from 2006 where he characterized that decision as binding. He then said that the use of the word binding was a mistake. It does not represent his view as to whether the decision is binding. But that's a separate issue from whether or not they believe that that decision is not restrictive interpretation. And other scholars, for instance, at the end of 1807, you can look at the opinion of Professor de Delman Greene, which explains that, and this is one of the scholars this report actually quoted, he actually explained that if you look at Anandas Velazquez, that decision is limited to the question of whether the contract by the national executive entities constitutes national public interest contracts because that was the only issue before that court. And to the extent this court thinks there is some ambiguity because we're dealing with a foreign system, these courts sometimes reason a different way than the common law courts, you can look at the opinion of the Republic, which took a similar position and explained that the issue of whether or not Article 150 excluded decentralized entities was not an issue in Anandas Velazquez. And then the Republic pointed to the subsequent decision in Delka and said, look, in the Delka, the Constitutional Chamber explained that what's important is that the subject matter of a contract relate directly to the national interest. That is what happened in the Delka where the Constitutional Chamber in fact said that the contract entered into by a state-owned Venezuelan company for the provision of a supply of electricity is a national public interest contract. Wasn't that contract the consummation of an executive-to-executive convention about provision of, I mean, can we understand that apart from that context where the Republic at the highest level was in fact involved? I think it was certainly connected to the agreement between the Venezuelan and the Brazil for the construction of a power line in a particular region. But what the Constitutional Chamber emphasized is that the contract between a Delka, the state-owned company and the Brazilian company was a separate contract subject to a separate legal regime. It did effectuate the interest which were embodied in the international agreement. But I would argue that actually the Republic's interest in keeping control of the system is more consequential than the interest in ensuring that there is electricity supply from the electric line between Venezuela and Brazil. This work can also look at the Attorney General's decision which was issued five years after Andres Velazquez. And there the Constitutional Chamber said that a contract by a state-owned agricultural bank is a national public interest contract. But the subject of that contract was to commit not just the bank but the Republic itself to indebtedness, right? So again it's sort of nominally conducted by a state-owned enterprise but the consequence is to bind the Republic itself in a way that I think distinguishes something that the state-owned enterprise acting as a private entity essentially. Yolanda, I agree. But I think it shows that participation of a national executive as a party is not a categorical requirement for something to be a national public interest contract. And certainly in Attorney General the Republic made itself liable for any kind of debt that was not paid by that agricultural bank. But by the same extension in this case the Republic will lose control of a $16 billion company which is of strategic importance for its oil industry. But it's not liable, right? There's none, can't reach beyond PDVSA to sue Venezuela for its sovereign assets in satisfaction of its bonds, right? Yolanda, that is correct. But I think again that's when we have to look at what role PDVSA and similar companies of a decentralized public administration play in Venezuela. And there is no straight line separating the national executive in Venezuela from companies like PDVSA which is a state-owned company. It's actually referenced in the Constitution which mandates Venezuelan state ownership of PDVSA. So this PDVSA is in fact a part, it's unquestionably a part of the national public administration in Venezuela. And the loss of the loss of Silco which is owned by PDVSA or any kind of other PDVSA assets which may be attached will be a direct loss to the Republic. In Venezuelan constitutional structure it is still viewed as directly tied to the national state interest. Okay. I think that we have asked you quite a few questions. We've kept you up. Are there any other questions the panel has right now? Okay. We will see you back for rebuttal. Don't go away. We have an attorney to answer for the appellee. Good morning and may it please the court. Masha Hansford of Davis Polk for appellees, the collateral agent and the trustee. The district court's thorough analysis of Venezuelan law has overwhelming support in multiple decisions of Venezuela's high constitutional court in the views of scholars of Venezuelan law including PDVSA's own experts in this case and their own prior scholarship and an extensive body of past practice. The constitutional chamber's binding interpretation of the term national public interest contract in Andres Velazquez establishes in the language that Judge Robinson referenced in that, my friend's argument, that the national executive itself must, rather than the state-owned company, must be a party. Well, it's such a competent organ, right? And so that's sort of where the ambiguity comes in. And one of the things I'm struggling with, and again this is not being a Venezuelan lawyer, is there was nothing in that case that implicated the issue that's before us here. Right? It was challenging the constitutionality of the statute that purported to let the national executive himself enter into these extra, you know, these transactions. Isn't the choice of language then a little bit like what we might call dicta within our own system? It's the terminology they use but nobody was asking them to consider the question of how broad the universe is of actors that are subjects that are going to be. There's rather been two responses to that. The first is, I think the concept of holding a dicta doesn't map out perfectly to the Venezuelan system because under article 335 of the Venezuelan constitution the constitutional chamber has supreme authority over interpretations of the constitution and this unequivocally is an interpretation of the constitution if there was any doubt about that it actually invokes the language of article 335. It says, proceeding as maximum and ultimate interpreter of the constitution. This is on page 2116 of the appendix. It says, as maximum and ultimate interpreter of the constitution the court chooses to set a comprehensive definition. So I do think it's binding for that reason. Even if you want to think about it in the more familiar terms of holding a dicta, you are right that this particular distinction was not an issue in Andres Velazquez and the court could have decided the case more narrowly but it chose not to do that. Instead it chose or said the term national public interest contract has been confused we are choosing to set out a broad rule and to set out a broad rule that would apply to a lot of situations and then apply it to this case. Even in the U.S. system I think that would be the Racia Desidensi that would be binding if the U.S. Supreme Court said the same thing. So if we're trying to decide whether Pena Veza is a competent organ of the national executive if that's sort of what this turns out we consider ourselves to be bound by both that case and this particular language. Given the extensive interconnection between Pena Veza and the state-owned enterprise why isn't it reasonable to understand Pena Veza especially given the significance of the conduct        to the well-being of the nation and the whole purpose of this doctrine to understand it to be a competent organ of the national executive. Judge Robinson under the Venezuelan Constitution it is very clear that state-owned entities like Pena Veza are not organs of the national executive. They're a completely distinct concept. Now they are very important to the Republic and I'd like to address how national laws address that but just to point you to the constitutional provisions that make that clear. Article 225 of the Constitution makes it clear that the national executive is the president the vice president and the cabinet ministers. That's title 5 of the Constitution. The decentralized state-owned entities are governed by article 6 of the Constitution a whole different article. They have a different regime, different appointments different powers so they're very important they're specifically provided for in the Constitution but they're entirely distinct. And I haven't really heard Pena Veza make the argument that this itself is the national executive as opposed to a decentralized entity. What I've heard it doing primarily is just deny that first part of the Andres Velazquez Rule, not reading it out, the language on page 2116 about it needing to be an organ of the national executive and just going straight to the second requirement that it be important. But to address the thrust of your question of why this is really important why shouldn't national assembly be required? I think the key point there is that article 150 is a constitutional floor it applies to this particular category of contracts that is entered into by the national executive it's a kind of separation of powers provision but the national assembly is fully empowered to require its own approval in additional cases the power comes from article 187 section 1 that allows the national   in matters of national importance and it has done so. And this is a really important part that I think Pedevesa's presentation has elided. Organic law 98 actually requires the approval of the national assembly for contracts of the republic and other entities that would cover the central bank and decentralized entities. It specifically requires     1014.  Pedevesa's  that law would be unconstitutional and that is a really strange result. Instead what happens here and I think it's understandable and the decision helps explain this. Requiring national assembly approval is a requirement of  assembly approval.     approval is not one that national assembly itself has chosen to  So they are trying to have this broad reading of article 150 that is contrary to what the court said and I think it is contrary and this is really significant to 40 years of on the ground practice in Venezuela. There is not a single debt financing transaction as you pointed out Judge Robinson by Pedevesa that has changed national assembly approval. Are there any in which majority stake in CITGO was pledged? There was actually a national   in CITGO and there was a transaction that pledged a 49.9% stake in  I can get you those sites. But I do think the kind of rule they are positing is to be a national public interest contract it requires the participation of a national executive unless it's a pledge for a majority interest in  That rule goes to the importance and not to the participation of whom. I think all these transactions many of whom were very important. You don't dispute that there are some state of    Not decentralized entities. So I think the first sentence of article 150 is also talking about contracts of national public interest. So it's not talking about decentralized public entities. But doesn't for example and I'm not going to get the article right but enter into a joint venture. That's something that  I had imagined that that was an example of a case in which such requirement is determined by law. Am I missing? Exactly. There are requirements including for joint venture contracts. I do not think those come from the first sentence of article 150. I think they come from 187.1. That authority to legislate matters of national importance. That's where that comes from. I do think the term national public interest contract is consistent and always includes decentralized entities. The constitutional authority to require approval comes from elsewhere. It's true that it did require national assembly approval pursuant to the hydrocarbon law. Again, tens of billions of dollars are financing. It's hard to say they're going to        PETA could have disinvalidated all those agreements at the drop of a pen. To turn to the active state and comedy issues, I was surprised to see my colleagues were so excited about this. I was surprised that they were so excited about this. I was surprised that they were so excited about this. I was  surprised             though recognition happened, of course,  science work was correct. Given that  no longer these times, why isn't it the flip of what you just said?  isn't it that we should presume that the administration stands by the brief filed on behalf of the republic unless she comes in and tells us otherwise? I think one of the factors is the role and authority of the national assembly. It has extremely harsh words about president Rodriguez's administration and her  I think it's very strange for this court to assume that she has filed this brief when she hasn't and criticized her own administration. That's an important piece of context in this case. The national assembly views were not the kind of unequivocal views of Venezuela. This was always hotly disputed. And now the president of the United States has changed the recognition of those views. It's just hard to ask us to have our analysis driven by what we know is happening in the  States. It's hard to ask us to have our analysis driven by what we know is happening in the United States. It's hard to ask us to have our analysis driven by what we know is     happening in the States. It's              ask us  our analysis driven by     States.  not to swat down our decisions. We should respectfully read whatever we get. We have to analyze the meat of what they say to us. If they're speaking with great authority but not persuasive, we don't trust them. I thought that's why what we're forced to do is get into this process. I   much ultimately the case could turn one way or the other on the weight of who the speaker is.  I agree with that entirely. If you're reading an opinion, it's vitamin C.     You start with a technical analysis of the law and the submissions, even if they were still, would only get the weight they  I can march through those, but the ultimate is it cannot be reconciled with how decisions have interpreted with the views of the Supreme Court. I can talk about that. Given all of those things, the fact that one of the many views that the National Assembly has expressed is that this is unconstitutional and we cannot carry the day. I think letting it carry the day would be what the Supreme Court rejected. Can I shift to the active state argument? You look at the September 2016 resolution and it specifically resolves to reject categorically that within the swap transaction 50.1 percent of the share is comprised of capital assets. I think that is  unequivocal statement of the then sovereign that A, approval is needed and B, we're not giving it. I would like to take that head on because I think the actual language of the resolution helps us but I think   validating the exchange. The resolution under article 187 that is referring to the 187 authority that is  investigative power to start an  and to obtain evidence. It does not say that it is a national public interest contract. It does not assert the power to approve or  approval. It does not do what the 2019 resolution did, which is say it is unconstitutional. Also, the 2019 resolution itself does not say that is what the May 2016 resolution did. It said it was the basis of the investigation. It was the basis of the  Only upon that investigation did the  assembly conclude it was a national public interest contract. That is 2019. We all agree that 2019 cannot be the  the investigation. They categorically rejected  You may go ahead with your swap. Why is that not a fairly direct instruction precisely? I agree with you.  national assembly condemned the swap and rejected it categorically but in the context of the control power, that is the predicate for the  We don't like this. We might not have the power to stop it but we don't like it. I think it is like a house resolution condemning the  of Afghanistan or Obama for a  prisoner swap. They can express condemnation or rejection but invocation of a power to invalidate the deal.  is all it is. It is not   we are  views that it is powerless to effectuate. It is the sovereign as far as our laws are concerned. Why isn't that a different scenario? I disagree with the premise that at the time it was the  At the time Maduro was the one in charge. It was the eyes of the market. Just the view. I think even if we have cases like civil wars or something and not until the end of the day when we recognize the winner that      we do look back retroactively. Isn't this a little bit like a civil war? I guess I would start with the principle from the last argument which is if you think that recognition is retroactive then the recognition should be retroactive. Again, that means that the national assembly has been reinstated to the resolution of an opposition party because the national assembly is not recognized sovereign at this time. It's not recognized sovereign. What's hard is we don't have anything filed in the record that would give us the hook to do that. I mean, maybe read the newspapers and that's enough. I guess to get to the first part of your question, the reason that it's important to read what the resolution actually did very precisely is that the act of state is a very potent doctrine. It says that even if the Venezuelan constitution did not give the  assembly this role because the national assembly was the sovereign at the relevant time, then it's actually still Trump even though that was not the rule of  In order to police the boundaries of this doctrine, I think the Supreme Court's decision has been very disciplined about how to apply that doctrine and coming in after the facts to language that says we reject this in the sense that we condemn it, we don't like it, but does not say the demon unconstitutional and void. To give that a trump card in this litigation I think would go beyond how the Supreme Court views the act of state doctrine but you can avoid all this just by ruling extraterritoriality because the site here was plainly the United States, the agreement was signed in New York as an obligation to pay a debt in New  The signature pages were exchanged in New York, the internal board approval probably occurred in Venezuela, but of course the extraterritoriality is the transaction entirely extraterritorial and I think this is on all boards here where there were Costa Rican state owned banks that had certain obligations but because the obligation was to be paid in New York in U.S. dollars the court said it was based in New York and here the physical collateral itself is also held in New  So the idea that changing the ownership of  which is physically located in New York is fully a taking within Venezuela does not make a lot of sense. I don't think there are any other questions for the panel. Thank you very much. We have your argument. Why don't we hear from Mr. Gottlieb and Mr. Timoteo. We are going to hold you to two minutes. One point about comedy and the act of state. The republic has explained why the entire discussion is incorrect from the republic's view. No one in Venezuela has explained in five different submissions what it means. Not the  national assembly, not the  regime, and not the Maduro regime itself which has repeatedly submitted contracts involving state-owned entities. This is why it was widely understood at the time there was a  validity issue. This is why less than 40% of the bondholders participated in the exchange. This was understood in the press. This court recognized that in the decision. The republic of Venezuela, you do not understand your own constitution. You think you have the power to review these transactions. It is not just the pledge of  It is the Rosneft pledge. That would be invalidated under their view. That was executed at the same time as this pledge. The Rosneft pledge was around the same time as this pledge transaction. The resolution asserted its authority and declared it null and  I want to address the act of state issues.  September resolution does not cite article 187. That is a fabrication.  A115 specifically the third provision of the statute.  addresses the situation where you have a recognized sovereign that changes during the course of litigation. It is recognized at the time of suit.  this course decision that determines the  that speaks for itself.       Two quick points.  article 150, the national assembly resolution expressly invoked article 150 as the basis for approval. One example is appendix 53-6. The predicate authority for the national assembly ability to require such approval is that these contracts be national public interest contracts. It is the same way in which the U.S. Congress cannot designate the growing of wheat in the backyard. The U.S.         Second point. How do you know that it was not reaching the question of decentralizing the ability to international public interest contract. We know it from the republic senate. We know it from the scholars.  at appendix 18-07.  at appendix 30-51 explained that it was not reaching that issue. National assembly commissioned the legal opinion when it was considering the change. This is 181-A at page 436-440. He expressly said not withstanding decentralizing entities cannot international public interest contract.  expressly said the contract is such that it has to go to national assembly. The other side addressed article 138 of the financial law. In fact, article 101 exempted certain contracts from the requirement of  That article did not extend to those entities. In addition to that, national assembly passed a  rejecting the mortgaging of claims in the litigation trust. National assembly passed a resolution rejecting the mortgaging  claims  the litigation  That was  because not authorized by the national assembly. Thank you to all counsel.  will take the case under advisement. With respect to all counsel on both sides, it was a very helpful briefing and excellent argument. We will now turn to the final case on the argument calendar for today, which is 25-794 global Inc. And we'll let the program and everybody come and get settled before we  We'll just let them all file out so we can hear you all without any distractions. Okay. Ms. Costello, you may begin, and as you have seen through some of the other arguments today, I understand you would like to reserve a minute for rebuttal. That means after your initial presentation we'll hear from the other side, but can you get him back up for a minute if there's anything you feel you would use  to respond to? Does that make sense? Okay. Whenever you're ready. Good afternoon, Your Honors. May it please the  My name is Sue Costello. I am pro se appellant, and this appeal rests on three undisputed facts. First, the failure to test the threshold. The District Court fundamentally denied my due process by choking my ability to present fraud in the inducement. The Court was required to test this threshold the moment I  the making of the  The judge opened the door to viability on the record, but when the appellee said the deal could still be open, she never held them to   is a fact. Two, the EFAA trigger. This case was filed in 2023 and is protected by the EFAA under the second circuit's ruling. Under the continuing violation doctrine, a hostile environment claim reoccurs with every new act in the patent. The harassment here continued on April 5, 2022 at the New York Attorney General's  The district judge owned action upon this ongoing hostile environment. She sexualized me on the record and put sexual words in my mouth to block me from   the fraud. She tamped with the transcript to sanitize the record. I formally identified this sexualization and the judicial bias to the magistrate. Because these successive acts occurred after the  date, the arbitration clause was  by operation of law. The arbitration clause was secured as a criminal tool to bypass the court. This exact abuse is why the  was enacted to   dismiss the case for failure to prosecute. It clearly was not. After the district court entered the case, more than a year passed without taking the steps to initiate the arbitration. She was given five separate    did not commence arbitration. Even affording her the solicitude she entitled, the district court was well within its discretion to dismiss the case. I'm happy to speak to the   statute which does not apply retroactively.  court says arbitrate. You don't get to appeal. Eventually you can get here. But it strikes me that that requirement might create some real policy tensions in the context of somebody who has a plausible claim because you're essentially requiring them to do exactly the thing that statute is designed to not require them to do. Is there any other step that somebody in that situation can take when they're caught in that fine and they assert an EFA claim? Can they seek interlocutory appeals? Or are they stuck on the arbitration and then appealing in due course? Your Honor, typically under this court's precedent, an interlocutory order in this case would not merge with the final judgment because of failure to prosecute. But I think in a situation where that forensic case, it may be possible to seek interlocutory appeals, but here Ms. Costello has not even alleged a discriminate interlocutory claim and again, all the facts were alleged prior to enactment. And yes, if you were to appeal an arbitration order, that would be at the end of the road after the arbitration and then you would have the opportunity to appeal, which Ms.  Costello would have been able to do had she gone to arbitration as ordered. She could have made the argument she made here today on appeal of that decision at that point in time. And I just want to say in  Your Honor, that there are a number of motions pending before the court. We ask that they be   if there's anything that opposing counsel said that you think would be useful to respond to, this is your opportunity to do that. Thank you,  I did try to commence arbitration. Jams, the designated arbitrator, refused to do it three or four times. They told me to do it. I was about to  it. I was about to mention it. She put sexual words in my mouth.  did you make sexual allegations? You didn't say things like those things happened to me. You didn't say sexual allegations. She said it so aggressively that I had to say no, no, never,  Even after the first time I said no. The reason I needed extensions to get to the  while the court was choking me is because both my father and my brother died during this. That's why I needed extensions. My letter 28 proved they made the same sexual back channels that the New York insurance said they would make back deals with women about sex. That's the EFA complaint. Thank you. Thank you very much. We appreciate the arguments of both parties. We will take the case under advisement. At some point there will be a written report. This court, having completed the business for which it was today convened, will now stand adjourned. Thank you all. Court is adjourned. adjourned.